DEFENDANT'S EXHIBIT B

BARRY J. PORTMAN
Federal Public Defender
Jay Rorty
Assistant Federal Public Defender
160 West Santa Clara Street, Suite 575
San Jose, CA 95113
Telephone: (408) 291-7753

Counsel for Defendant Lopez

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-07-70262 HRL |
| Plaintiff, | DECLARATION OF DEFENDANT CLAUDIA LOPEZ |
| vs. | |
| CLAUDIA LOPEZ, | |
| Defendant. | |

I, Claudia Lopez, hereby declare as follows:

1. I am the defendant in the above captioned case.

2. I live at 654 Rebecca Way #3 in San Jose, California. I live with my daughter, Reign Maria Lomeli, who is 3 years old. My mother, Amintha Peterson, and my step-father, Jay Peterson, live in a separate part of the house.

3. On the afternoon of April 18, 2007, I was alone at home working on the computer. My computer is near the front door. The door was open, but the screen door was shut. Around 4:30, someone knocked. He identified himself as a federal postal inspector, flashed his badge at me and asked if he could ask me some questions.

4. I let the inspector into the house and we went into the kitchen. We sat down and

| | | |
|---|---|---|
| 1 | | he told me that he had some questions for me to answer about a case he had going |
| 2 | | on. I asked him what it was about, and he said "Can you first answer some |
| 3 | | questions, and then I'll tell you what about?" At this point I asked, "Don't I need a |
| 4 | | lawyer?" The inspector replied that the fact that I was asking for a lawyer sounded |
| 5 | | suspicious. I told him that I knew from some of my classes that I should have a |
| 6 | | lawyer and that I needed a lawyer. I asked him how I could go about getting a |
| 7 | | lawyer. He replied that I really didn't need a lawyer for what he was going to ask |
| 8 | | me. Again, I asked what this was about, and that I really thought I needed a |
| 9 | | lawyer. At that point, he said, "well, if its going to be like that...I just want to ask |
| 10 | | you some questions, if you sign this I can tell you what this is about, and then you |
| 11 | | can figure out if you need a lawyer." Throughout our encounter, I voiced my |
| 12 | | concerns about needing a lawyer, and the inspector kept saying that it was |
| 13 | | suspicious that I wanted a lawyer. |
| 14 | 5. | The inspector was referring to a form that he pulled out and handed to me. While |
| 15 | | this was occurring, my daughter, her father, and my dog came into the house, and |
| 16 | | their presence made me scared. I told my daughter's father not to ask any |
| 17 | | questions and to go to the park. They left after my daughter was changed and used |
| 18 | | the restroom. The inspector told me that if I signed the form that he would make |
| 19 | | things easy for me – he couldn't promise me anything, but that it wouldn't be that |
| 20 | | big of a deal if I'd go ahead and sign it. He said that he would be able to |
| 21 | | coordinate when I would come in, and it would be a lot easier than if they had to |
| 22 | | arrest me because then I would have to do everything at the police station. I signed |
| 23 | | the form. |
| 24 | 6. | I asked the inspector what would happen to me, and he said that he couldn't tell |
| 25 | | me for sure, but that from what he'd seen, I wouldn't go to trial – I'd enter a plea |
| 26 | | and they would just monitor me. |

Lopez Declaration                                    2

7. The inspector told me that he needed writing samples. If it was not my handwriting, he would leave, and if it was, we would go from there. He told me that if I didn't do the writing sample then, he would get an arrest warrant and could arrest me at anytime. He said he could arrest me at school, and then we could do the writing samples at the jail.

8. At this point I was scared, I was worried about my daughter and parents. The house I was in is my parents' property, and I wanted to keep them out of it and limit any damage to them.

9. The inspector pulled out a writing sample form, which was a sheet with different letters that I had to copy. He also pulled out post office mail slips for me to fill out. I was so nervous that my handwriting was shaky. The inspector made me fill out at least five of the post office slips. He said he would have me continue until he was satisfied. Finally, he said I could stop and that it looks like my writing.

10. At some point, the inspector asked me if I sent rent money to Jason Wilson. I lied and said yes, that I sent him a money order. I again said that I thought I needed to talk to a lawyer. He then asked me "straight out – did you send liquid LSD to Alaska?" I responded that I had. He asked me who I got the LSD from, and I told him that I got it from a hippie near Haight Street in San Francisco and that I traded some marijuana for it. He asked me who I knew that I could get something like that, and I told him that it was just something I ran into. He told me that Jason had said he was going to give me $800 for it, but I told him that I was not expecting any compensation for it.

11. The inspector then asked me if I knew someone in Seattle, but then apologized and said he had the wrong person.

12. He asked me if I was surprised that Jason hadn't gotten a hold of me to tell me whether he'd received the package, but I told him that I was wondering but I

1  thought it wasn't a big deal.

2  13.  Th inspector asked if I would like to give a written statement. I told him no, that I
3  would want a lawyer. He then asked if I would give him another writing sample. I
4  told him no you've already gotten some. His response was, "Well, I've got to try."

5  I declare under penalty of perjury that the foregoing is true and correct to the best of my
6  recollection, except for those statements made on information and belief and as to those matters I
7  am informed and believe them to be true.

8  Executed this 17 day of October, 2007, at San Jose, California.

_____
Claudia Lopez