SCOTT N. SCHOOLS (SCN 9990)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

JEFFREY D. NEDROW (CSBN 161299)
Assistant United States Attorney

  150 Almaden Blvd., Suite 900
  San Jose, CA 95113
  Telephone: (408) 535-5045
  FAX: (408) 535-5066
  jeff.nedrow@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR 07-00303-JF |
|           Plaintiff, ) | UNITED STATES' OPPOSITION TO |
|           v. ) | MOTION TO SUPPRESS EVIDENCE |
| CLAUDIA LOPEZ, ) | |
|           Defendant. ) | |

## I. INTRODUCTION

Defendant Claudia Lopez has filed a motion to suppress statements which she voluntarily provided to law enforcement agents in a consensual, non-custodial interview conducted at her residence on April 18, 2007. Despite signing a form in which she expressly acknowledged that she was voluntarily providing the statements, Lopez now contends that the statements were involuntary and must be suppressed because they were obtained in violation of the Due Process Clause.

The defense motion is meritless and should be rejected. The declaration of U.S. Postal Inspector Mitchell A. Herzog submitted in support of this opposition establishes that her statements were voluntary. Lopez never requested a lawyer, and Inspector Herzog did not

threaten to arrest her, deny her access to a lawyer, intimidate her, or engage in any coercive conduct. To the contrary, the evidence suggests that Inspector Herzog conducted the interview in a calm, professional manner at Lopez's kitchen table, with family members intermittently present, such that she thanked him afterwards for being so "nice," hardly the conduct of someone who has been pressured into involuntary statements. The evidence further demonstrates, without contradiction, that Inspector Herzog went above and beyond the requirements of the Constitution by reading Lopez her full Miranda warnings and obtaining a written waiver from Lopez, both steps which he was not required to do in this non-custodial setting. Her signature on the written Miranda waiver form, in which she expressly acknowledged that she had not been subject to any coercion, should be viewed as the most reliable and accurate statement from the defendant regarding her voluntariness. The only evidence that Lopez was coerced rests with her recently prepared declaration, a document which must be viewed with some skepticism in light of her own acknowledgment that she initially lied to Inspector Herzog about her LSD trafficking activity in the April 18, 2007 interview.

     As the evidence supports a finding of voluntariness, Lopez's statements to Inspector Herzog are properly admissible at trial in this case. While the government submits that the record before the Court establishes the voluntariness of Lopez's statements and provides ample factual basis for a denial of the defense motion, the government acknowledges the need for an evidentiary hearing on this issue and does not oppose the defense request for an evidentiary hearing. With respect to the voluntariness requirement of the Fifth Amendment, "[a] defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." Jackson v. Denno, 378 U.S. 368, 380, 84 S.Ct. 1774, 1782, 12 L.Ed.2d 908 (1964). Accordingly, the government respectfully joins in the defense request for an evidentiary hearing with respect to this motion.

FACTS[1]

In March 2007, Inspector Herzog was contacted by a Postal Inspector in Anchorage, Alaska named Norman Longaza about an investigation involving a package which had originated in San Jose. Herzog Declaration, ¶ 3. Inspector Longaza told Inspector Herzog that he had interdicted an Express Mail package sent to Alaska from an address in San Jose. Herzog Declaration, ¶ 3. Upon obtaining a federal search warrant, Inspector Longaza opened the package and discovered approximately six grams of LSD. Herzog Declaration, ¶ 3. The package listed a return address of Sandra Cruz, 1127 Boyton #A, San Jose, CA 95117. Herzog Declaration, ¶ 3. Further investigation revealed that the package had been mailed from the Westgate Station Post Office branch in San Jose. Herzog Declaration, ¶ 4.

DEA Agents and Postal Inspectors subsequently conducted a controlled delivery of the package at the address listed on the package in Anchorage, AK. Herzog Declaration, ¶ 5. The package was delivered to one Jason Wilson. Herzog Declaration, ¶ 5. After Wilson opened the package and triggered an electronic device placed by law enforcement in the package, law enforcement contacted Wilson and read him his Miranda rights. Herzog Declaration, ¶¶ 5-6. Wilson admitted ordering the LSD from Sandra Cruz, a person whom he also knew as Claudia Lopez, in San Jose. Herzog Declaration, ¶ 6. Wilson gave permission for the phone number of Claudia Lopez to be identified from a review of his cell phone. Herzog Declaration, ¶ 6. Wilson stated that he had contacted Cruz/Lopez approximately three weeks earlier and asked her to send him some money to help pay the rent. Herzog Declaration, ¶ 6. Wilson stated Cruz/Lopez subsequently called him back and told him she had sent him some good "wine." Herzog Declaration, ¶ 6. Wilson stated he asked her if it was "Jerry Garcia wine" and she answered affirmatively. Herzog Declaration, ¶ 6. Wilson stated "Jerry Garcia wine" was slang for LSD. Wilson stated Cruz/Lopez was expected to be paid $800 for the LSD. Herzog Declaration, ¶ 6.

Based upon Wilson's statement, Inspector Herzog subsequently determined that the

---

[1] The government relies upon the concurrently submitted declaration of U.S. Postal Inspector Mitchell A. Herzog in support of the factual assertions contained within this submission.

GOVT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS                3

phone number he used to contact "Sandra Cruz" was a cell phone subscribed to by Claudia Lopez at 654 Rebecca Way in San Jose. Herzog Declaration, ¶ 7. Inspector Herzog confirmed with a local letter carrier that Lopez lived in Apartment 3 at 654 Rebecca Way. Herzog Declaration, ¶ 7. Based on the totality of these facts, Inspector Herzog decided to contact Lopez. Herzog Declaration, ¶ 7.

On April 18, 2007, at approximately 5:00 p.m., Inspector Herzog contacted Claudia Maria Lopez at her residence in San Jose and interviewed her. Herzog Declaration, ¶ 8. Inspector Herzog prepared two memoranda summarizing this interview, one on April 20, 2007 and one on October 20, 2007. Herzog Declaration, ¶ 8. These memoranda are attached, respectively, as Exhibits 1 and 2 to the Herzog declaration. Herzog Declaration, ¶ 8.

Lopez answered the door upon Inspector Herzog's arrival at her residence. Herzog Declaration, ¶ 9. Lopez identified herself as Claudia Lopez. Herzog Declaration, ¶ 9. Inspector Herzog showed her his credential and explained that he was an investigator for the Post Office. Herzog Declaration, ¶ 9. Lopez invited Inspector Herzog into the apartment and restrained her dog. Herzog Declaration, ¶ 9. After Lopez had her dog sit down in the living room, she invited Inspector Herzog to sit at the kitchen table. Herzog Declaration, ¶ 9. Lopez asked Inspector Herzog why he needed to speak with her. Herzog Declaration, ¶ 9. Inspector Herzog explained to her that he needed to advise her of her Miranda rights before he could ask her any questions. Herzog Declaration, ¶ 9. Lopez asked Inspector Herzog if she needed a lawyer. Herzog Declaration, ¶ 9. Lopez never told Inspector Herzog that she wanted a lawyer, at that point or any subsequent stage of the interview. Herzog Declaration, ¶ 9. Lopez explained that she was taking classes at San Jose State and did not want her rights violated. Herzog Declaration, ¶ 9. Inspector Herzog explained that he could not advise her if she needed a lawyer. Herzog Declaration, ¶ 9. Inspector Herzog told Lopez that he had no intention of violating her rights and that in fact he needed to explain her rights to her in the form of a Miranda warning. Herzog Declaration, ¶ 9. Inspector Herzog pulled a PS Form 1067 Warning and Waiver of Rights form from his file and began to explain to Lopez her rights her per the Miranda warnings on the form. Herzog Declaration, ¶ 9.

The PS Form 1067 is a standard U.S. Postal Inspection Form used in a witness interview to put in writing an individual's voluntary decision to waive their Miranda rights and provide statements. Herzog Declaration, ¶ 10. (A copy of the form which Inspector Herzog used and which Lopez signed is attached as Exhibit 3 to Inspector Herzog's declaration). Inspector Herzog read the entirety of this form to Lopez at the time of the interview. Herzog Declaration, ¶ 10. Inspector Herzog then provided the form to Lopez so that she could review it. Herzog Declaration, ¶ 10. At approximately 5:05 p.m., Lopez signed the warning portion of the form indicating that she understood her rights. Herzog Declaration, ¶ 10. Lopez signed beneath a sentence which stated, "I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are." Herzog Declaration, ¶ 10.

After Lopez signed the Warning portion of the form, Inspector Herzog began to explain the Waiver of Rights portion of the form. Herzog Declaration, ¶ 11. Inspector Herzog and Lopez talked for nearly seven minutes about the Waiver of Rights portion of the form. Herzog Declaration, ¶ 11. Inspector Herzog explained to Lopez that she could speak with him and not answer any questions that she did not want to answer. Herzog Declaration, ¶ 11. He also told her that she could write down the questions and that they could go on with the interview and she could again decline to answer or even end the interview if she wished. Herzog Declaration, ¶ 11. Lopez wanted to know why Inspector Herzog was there, but she did not express any concern about speaking with him. Herzog Declaration, ¶ 11.

At approximately 5:12 p.m., Lopez signed the Waiver portion of the Waiver form and voluntarily agreed to answer Inspector Herzog's questions. Herzog Declaration, Exhibit 2. Lopez signed the form beneath the following paragraph:

> I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Herzog Declaration, Exhibit 2.

After answering some background questions, Lopez initially stated that she knew Jason Wilson and had traveled around with him to "Dead Head" concerts. Herzog Declaration, ¶¶ 14-15. When Inspector Herzog asked her if she had contacted Wilson in February 2007, she said he

GOVT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS                    5

1  had contacted her by e-mail. Herzog Declaration, ¶ 15. Lopez said she knew Wilson's
2  girlfriend. Herzog Declaration, ¶ 15. Lopez then stated that she had spoken to Wilson during the
3  middle of February. Herzog Declaration, ¶ 15. Lopez stated that Wilson had asked her for some
4  rent money. Herzog Declaration, ¶ 15. Lopez said she sent him a $300 money order. Herzog
5  Declaration, ¶ 15. She stated that she no longer possessed the receipt for the money order, but
6  that she had purchased it at a cash place near San Jose State, where she attends classes. Herzog
7  Declaration, ¶ 15.

8  At some point during the interview, Lopez's daughter and her daughter's father entered
9  the apartment. Herzog Declaration, ¶ 16. Lopez appeared embarrassed and asked the daughter's
10 father if he would take her daughter to the park. Herzog Declaration, ¶ 16. Lopez stated that she
11 needed to speak with me in private. Herzog Declaration, ¶ 16. Inspector Herzog did not make
12 any comments regarding the presence of Lopez's daughter and the daughter's father. Herzog
13 Declaration, ¶ 16. Inspector Herzog stated that her daughter's father was staying with her for a
14 while as he was looking for work in the area. Herzog Declaration, ¶ 16.

15 After Lopez made the statement that she sent Wilson a money order, but made no
16 reference to narcotics, Inspector Herzog explained to Lopez that he needed handwriting
17 exemplars. Herzog Declaration, ¶ 17. Inspector Herzog never told Lopez that he was going to
18 arrest her at any time during the interview; however, he did tell her that she did not have to
19 comply with the request for handwriting exemplars, but that he could obtain a grand jury
20 subpoena which would require her to provide the handwriting. Herzog Declaration, ¶ 17. I
21 explained that it was much easier to take care of the issue at that time rather than appearing
22 before the grand jury. Herzog Declaration, ¶ 17. Lopez voluntarily consented to providing
23 handwriting exemplars and at approximately 5:35 p.m., she began to provide handwriting
24 exemplars. Herzog Declaration, ¶ 17. When she had completed the exemplars, Inspector Herzog
25 looked at them and compared them to the Express Mail label he had pertaining to the package
26 containing the LSD. Herzog Declaration, ¶ 17. Inspector Herzog told Lopez that he felt that her
27 handwriting exemplars looked very similar to the handwriting on the express label. Herzog
28 Declaration, ¶ 17.

After Inspector Herzog made the point regarding the handwriting exemplars, Lopez changed her story and admitted that she sent the liquid LSD to Jason Wilson in Anchorage. Herzog Declaration, ¶ 18. Lopez stated that Jason had requested the LSD from her. Herzog Declaration, ¶ 18. Lopez stated that she never expected to receive any money and had never told Jason how to package the LSD into individual dosage amounts or to sell the LSD in local bars. Herzog Declaration, ¶ 18. Lopez maintained the LSD was for Wilson's personal use. Herzog Declaration, ¶ 18. When asked about the source of the LSD, Lopez said she got the LSD on Haight Street, in San Francisco. Herzog Declaration, ¶ 18. She explained that she had traded marijuana for the LSD. Herzog Declaration, ¶ 18. She again repeated that the LSD she had mailed to Wilson was for his personal use only. Herzog Declaration, ¶ 18. Lopez was asked if there was a Sandra Cruz and she admitted that "Sandra Cruz" was a name she had made up when sending the express mail package to Jason Wilson. Herzog Declaration, ¶ 18. She further stated that the Boyton address was phony and that she lived around the corner from Boyton. Herzog Declaration, ¶ 18. Lopez again repeated that Wilson had asked her for the LSD. Herzog Declaration, ¶ 18.

Inspector Herzog briefly reviewed the handwriting exemplars and concluded that she was attempting to disguise her writing. Herzog Declaration, ¶ 19. Inspector Herzog asked Lopez if she could provide him with better-quality handwriting and she laughed and said "you already have what you need," or words to that effect. Herzog Declaration, ¶ 19. As Inspector Herzog left, Lopez thanked him for being so nice to her and apologized for not telling him the truth right away when he had asked if she had sent LSD to Jason. Herzog Declaration, ¶ 22.

Lopez asked if she _needed_ a lawyer, but never requested a lawyer. Herzog Declaration, ¶ 22. The interview was conducted in a calm, professional manner. Herzog Declaration, ¶ 23. Inspector Herzog did not raise his voice or display his firearm during the interview. Herzog Declaration, ¶ 23. Inspector Herzog did not threaten, intimidate, coerce, or force Lopez into providing her statements in any way. Herzog Declaration, ¶ 23. To the contrary, she was free to go or terminate the interview at any time. Herzog Declaration, ¶ 23. Lopez was never handcuffed and she was not taken into custody. Herzog Declaration, ¶ 23. Inspector Herzog did

1 not threaten to arrest her. Herzog Declaration, ¶ 22. Overall, Lopez conducted herself as an
2 intelligent and rational individual who understood the purpose of the questioning and understood
3 the warning and waiver form which she completed in my presence. Herzog Declaration, ¶ 23.
4 Inspector Herzog personally watched Lopez read and sign the waiver form. Herzog Declaration,
5 ¶ 23.

6                 III. ARGUMENT
7           A.  Lopez's Statements Were Voluntary
8       Lopez argues that her statements were the result of impermissible coercion which
9 violated her due process rights, and that they therefore must be suppressed as involuntary. As the
10 factual record does not support this argument, the motion to suppress should be denied.
11       Evidence coerced from a defendant is not admissible at that defendant's trial. Chavez v.
12 Martinez, 538 U.S. 760 (2003) (plurality opinion) (use of involuntary statements at defendant's
13 trial violates Fifth Amendment). To determine if testimonial evidence supplied by a defendant
14 was involuntary, a court must ask whether, in the totality of the circumstances, law enforcement
15 officials obtained the evidence by overbearing the will of the accused. See Haynes v.
16 Washington, 373 U.S. 503, 513-14 (1963). The factual inquiry centers upon (1) the conduct of
17 law enforcement officials in creating pressure and (2) the suspect's capacity to resist that
18 pressure. See Mincey v. Arizona, 437 U.S. 385, 399-401 (1978) (confession involuntary because
19 continued police interrogation of hospitalized suspect overwhelmed suspect's free will); see also
20 Davis v. N.C., 384 U.S. 737, 752 (1966) (confession involuntary because police repeatedly
21 interrogated jailed suspect held incommunicado over 16-day period).
22       The Ninth Circuit has instructed courts to consider the totality of the circumstances to
23 determine "whether the government obtained the statement by physical or psychological
24 coercion, or by improper inducement so that the suspect's will was overborne." United States v.
25 Harrison, 34 F.3d 886, 890 (9th Cir. 1994). To determine whether a defendant's statement is the
26 product of coercion and therefore, involuntary, the Ninth Circuit has commonly referenced the
27 following factors: (1) the location of the questioning (United States v. Fisher, 137 F.3d 1158,
28 1165 (9th Cir. 1998); (2) whether Miranda warnings were given (Anderson v. Calderon, 232 F.3d

GOVT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS         8

1053, 1072-73 (9th Cir. 2000); and whether the accused initiated contact with law enforcement officials (Pollard v. Galarza, 290 F.3d 1030, 1035-36 (9th Cir. 2002). The Ninth Circuit also considers the defendant's personal characteristics, such as youth (United States v. Male Juvenile, 280 F.3d 1008, 1022-23 (9th Cir. 2002), drug problems (Shackleford v. Hubbard, 234 F.3d 1072, 1081-82 (9th Cir. 2000), psychological problems (United States v. Huynh, 60 F.3d 1386, 1388 (9th Cir. 1995), physical condition (Cunningham v. City of Wenatchee, 345 F.3d 802, 810-11 (9th Cir. 2003); and experience with the criminal justice system (United States v. Rodriguez-Rodriguez, 364 F.3d 1142, 1146 (9th Cir. 2004, amended by 393 F.3d 849 (9th Cir. 2005). The Ninth Circuit has held that promises of leniency are not sufficiently coercive to constitute a Fifth Amendment violation in and of themselves. United States v. Okafor, 285 F.3d 842, 847 (9th Cir. 2002).

All of the above-summarized factors in this case support a finding that Lopez voluntarily made her statements to Inspector Herzog. The circumstances of the interview itself were clearly non-coercive. The interview occurred at Lopez's kitchen table, with family members intermittently present. She was Mirandized and provided a written waiver of her Miranda rights. She voluntarily signed a form expressly stating that she was not coerced. She repeatedly initiated conversation with Inspector Herzog, asking him on several occasions why he was there. She was informed that she was free to terminate the conversation and free not to answer any questions. The interview was conducted in a calm, professional manner, sufficiently so that Lopez thanked the inspector for being so nice. Lopez was not taken into custody, and was not threatened with the possibility of custody.

Nor is there any evidence that Lopez's personal characteristics made her susceptible to coercion. Lopez is a mature young woman with a child. She is a successful student at San Jose State with sufficient sophistication that she discussed her rights with Inspector Herzog at length. There is no evidence of drug, psychological, or physical problems that would call into question her ability to think clearly in an interview. She has sufficient criminal history to suggest that she understands the terms of the criminal justice system; indeed, her repeated prodding of Inspector Herzog suggest that she was trying to obtain information from him about his investigation.

The defense has failed to provide any credible evidence in support of its argument of

1 unconstitutional coercion. The argument that Inspector Herzog was coercive because he did not
2 immediately tell her the purpose of his questioning is specious; law enforcement officials are not
3 required to divulge the purpose of their questioning at the outset, and are permitted to tactically
4 pursue a line of questioning with a suspect such as Lopez. Nor did Inspector Herzog threaten
5 Lopez in any way. The assertion that he threatened to arrest her is inaccurate, and even if true,
6 would not in itself support a level of coercion that would support suppression in this case.
7 Lopez's claim that she requested, and was denied, access to a lawyer is similarly false. It is
8 demonstrably false based upon her signed Miranda waiver form. To the extent evidence of these
9 facts exist only in Lopez's declaration, Lopez's own credibility is strongly suspect in light of her
10 decision to openly lie to Inspector Herzog with respect to her involvement in trafficking in LSD
11 with Wilson. As for the promises of leniency, while it is true that Inspector Herzog truthfully
12 suggested cooperation might benefit her, the statements were general and vague in nature, and
13 the Ninth Circuit has expressly stated that promises of leniency do not, in themselves, create
14 coercion. United States v. Okafor, 285 F.3d 842, 847 (9th Cir. 2002). The evidence in this record
15 clearly supports a finding of voluntariness as to the defendant's statements.

## IV.    CONCLUSION

Lopez's motion is without merit. The government does not object to an evidentiary hearing in this case, and believes such a hearing is required to establish the voluntariness of the defendant's statement for admissibility purposes at trial; however, the government also submits that the facts before the Court clearly demonstrate that Lopez's statements were voluntary. There is no credible basis for the requested suppression, and the motion to suppress should be denied.

Respectfully submitted,

DATED: October 24, 2007     SCOTT N. SCHOOLS
United States Attorney

/s/
JEFFREY D. NEDROW
Assistant United States Attorney