SCOTT N. SCHOOLS (SCN 9990)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

JEFFREY D. NEDROW (CSBN 161299)
Assistant United States Attorney

   150 Almaden Blvd., Suite 900
   San Jose, CA 95113
   Telephone: (408) 535-5042
   FAX: (408) 535-5066
   jeff.nedrow@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR No.: 07-00303-JF |
|             Plaintiff, ) | |
|   v. ) | |
| MITCHELL A. HERZOG, ) | DECLARATION OF MITCHELL A. HERZOG |
|             Defendant. ) | |

I, MITCHELL A. HERZOG, declare:

    1. I am a United States Postal Inspector currently assigned to investigate the unlawful transportation of contraband, including Title 21 controlled substances, through the United States Mail. I have been a Postal Inspector since November 1985. As part of my duties, I investigate incidents where the mail system is used for the purpose of transporting controlled substances.

    2. In March 2007, I participated in a one-week drug interdiction in Texas studying the various mailing characteristics of narcotics traffickers for outgoing parcels. I have interviewed witnesses and cooperating individuals regarding illegal trafficking in drugs and have read official reports of other officers on these matters. During March 2007, I also completed an online training course presented by the United States Postal Inspection Service addressing current trends

DECLARATION OF
MITCHELL A. HERZOG                       1

1 | in narcotics mailing, reasonable suspicion, probable cause, and profiling.

2 |     3. As a part of my training as a U.S. Postal Inspector, I have specifically received training in interviewing techniques. This training included instruction in advising persons of their <u>Miranda</u> rights during interrogations and the proper handling of a suspect's invocation of his or her rights under <u>Miranda</u>. In addition, through my involvement in a number of investigations as a U.S. Postal Inspector, I have gained experience in informing individuals of their <u>Miranda</u> rights. I have personally encountered circumstances in which defendants have invoked their right to remain silent and/or right to counsel under <u>Miranda</u>, and understand, as a matter of my training and experience, that I am required to stop interrogating a suspect after such an invocation.

    4. In March 2007, I was contacted by a Postal Inspector in Anchorage, Alaska named Norman Longaza about an investigation involving a package which had originated in San Jose. Inspector Longaza informed me that he had interdicted an Express Mail package sent to Alaska from an address in San Jose. Upon obtaining a federal search warrant, Inspector Longaza opened the package and discovered approximately six grams of LSD. The package listed a return address of Sandra Cruz, 1127 Boyton #A, San Jose, CA 95117.

    4. I reviewed a copy of the mailing label on the package provided to me by Inspector Longaza. I subsequently determined from the mailing label information and other investigation that the package had been mailed from the Westgate Station Post Office branch in San Jose.

    5. DEA Agents and Postal Inspectors subsequently conducted a controlled delivery of the package at the address listed on the package in Anchorage, AK. The package was delivered to one Jason Wilson. Wilson opened the package, triggering an electronic device which had been concealed in the package pursuant to federal court order.

    6. The Alaskan Postal Inspectors contacted Wilson read him his Miranda rights, and he voluntarily agreed to waive them and provide a statement. During this interview, Wilson admitted ordering the LSD from Sandra Cruz, a person whom he also knew as Claudia Lopez, in San Jose. Wilson gave permission for the phone number of Claudia Lopez to be identified from a review of his cell phone. Wilson stated that he had contacted Cruz/Lopez approximately three weeks earlier and asked her to send him some money to help pay the rent. Wilson stated

DECLARATION OF
MITCHELL A. HERZOG                     2

Cruz/Lopez subsequently called him back and told him she had sent him some good "wine." Wilson stated he asked her if it was "Jerry Garcia wine" and she answered affirmatively. Wilson stated "Jerry Garcia wine" was slang for LSD. Wilson stated Cruz/Lopez was expected to be paid $800 for the LSD. Wilson also stated Cruz/Lopez told him there were "probably a couple of hundred drops" of LSD in this bottle.

   7. Based upon Wilson's statement, I subsequently determined that the phone number he used to contact "Sandra Cruz" was a cell phone subscribed to by Claudia Lopez at 654 Rebecca Way in San Jose. I confirmed with a local letter carrier that Lopez lived in Apartment 3 at 654 Rebecca Way. Based on these facts, as well as Wilson's statement and the development of other investigative information, I established that Lopez was the focus of my investigation and decided to contact her.

   8. On April 18, 2007, at approximately 5:00 p.m., I contacted Claudia Maria Lopez at her residence in San Jose and interviewed her. I have summarized that interview in two separate memoranda, one dated April 20, 2007, and a more detailed memorandum dated October 20, 2007. These memoranda are attached, respectively, as Exhibits 1 and 2 to my declaration.

   9. Lopez answered the door upon my arrival at her residence. Lopez identified herself as Claudia Lopez. I showed her my credential and explained that I was an investigator for the Post Office. She invited me into the apartment and restrained her dog. After Lopez had her dog sit down in the living room, she invited me to sit at the kitchen table. We talked about her dog and I told her that I had just recently put down my German Shepherd. Lopez then asked me why I needed to speak with her. I explained to her that I needed to advise her of her Miranda rights before I could ask her any questions. Lopez asked me if she needed a lawyer. She never told me that she wanted a lawyer, at that point or any subsequent stage of the interview. Lopez explained that she was taking classes at San Jose State and did not want her rights violated. I explained that I could not advise her if she needed a lawyer. I told her that I had no intention of violating her rights and that in fact I needed to explain her rights to her in the form of a Miranda warning. I pulled a PS Form 1067 Warning and Waiver of Rights form from my file and began to explain her rights her per the Miranda warnings on the form.

DECLARATION OF
MITCHELL A. HERZOG                              3

10. The PS Form 1067 is a standard U.S. Postal Inspection Form used in a witness interview to put in writing an individual's voluntary decision to waive their Miranda rights and provide statements. (A copy of the form which I used and which Lopez signed is attached as Exhibit 3 to this declaration). I read the entirety of this form to Lopez at the time of the interview. I then provided the form to Lopez so that she could review it. At approximately 5:05 p.m., Lopez signed the warning portion of the form indicating that she understood her rights. Lopez signed beneath a sentence which stated, "I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are."

11. After Lopez signed the Warning portion of the form, I began to explain the Waiver of Rights portion of the form. We talked for nearly seven minutes about the Waiver of Rights portion of the form. I explained to Lopez that she could speak with me and not answer any questions that she did not want to answer. I also told her that she could write down the questions and that we could go on with the interview and she could again decline to answer or even end the interview if she wished. Lopez wanted to know why I was there, but she did not express any concern about speaking with me.

12. At approximately 5:12 p.m., Lopez signed the Waiver portion of the Waiver form and voluntarily agreed to answer my questions. Exhibit 2. Lopez signed the form beneath the following paragraph:

> I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

13. Lopez did not appear to have any difficulty speaking or understanding English during our conversation. After signing the waiver form, Lopez agreed to answer questions regarding her involvement in the scheme. Lopez stated, however, that she wanted to stop the interview if she no longer wanted to answer questions.

14. At the start of the interview, I asked Lopez to provide basic background information, and I completed a Postal Inspection Service form called an Investigative History File.

15. Lopez initially stated that she knew Jason Wilson and had traveled around with him to "Dead Head" concerts. When I asked her if she had contacted him in February 2007, she said he

DECLARATION OF
MITCHELL A. HERZOG                                4

had contacted her by e-mail. Lopez said she knew Wilson's girlfriend. Lopez then stated that she had spoken to Wilson during the middle of February. Lopez stated that Wilson had asked her for some rent money. Lopez said she sent him a $300 money order. She stated that she no longer possessed the receipt for the money order, but that she had purchased it at a cash place near San Jose State, where she attends classes.

16. At some point during the interview, I recall Lopez's daughter and her daughter's father entering the apartment. Lopez appeared embarrassed and asked the daughter's father if he would take her daughter to the park. Lopez stated that she needed to speak with me in private. I never made any comments regarding the presence of her daughter and the father. Lopez stated that her daughter's father was staying with her for a while as he was looking for work in the area.

17. After Lopez made the statement that she sent Wilson a money order, but made no reference to narcotics, I explained to Lopez that I needed handwriting exemplars. I never told Lopez that I was going to arrest her at any time during the interview; however, I did tell her that she did not have to comply with my request for handwriting exemplars, but I could obtain a grand jury subpoena which would require her to provide the handwriting. I explained that it was much easier to take care of the issue at that time rather than appearing before the grand jury. Lopez voluntarily consented to providing handwriting exemplars and at approximately 5:35 p.m., she began to provide me with handwriting. At my request, Lopez completed a PS Form 582, which is basic handwriting example. I then asked her to complete five blank Express Mail labels. When she had completed the exemplars, I looked at them and compared them to the Express Mail label I had recovered. I told Lopez that I felt that her handwriting exemplars looked very similar to the handwriting on the express label.

18. After I made the point regarding the handwriting exemplars, Lopez admitted that she sent the liquid LSD to Jason Wilson in Anchorage. Lopez stated that Jason had requested the LSD from her. Lopez stated that she never expected to receive any money and had never told Jason how to package the LSD into individual dosage amounts or to sell the LSD in local bars. Lopez maintained the LSD was for Wilson's personal use. When asked about the source of the LSD, Lopez said she got the LSD on Haight Street, in San Francisco. She explained that she had

DECLARATION OF
MITCHELL A. HERZOG                               5

traded marijuana for the LSD. She again repeated that the LSD she had mailed to Wilson was for his personal use only. Lopez was asked if there was a Sandra Cruz and she admitted that "Sandra Cruz" was a name she had made up when sending the express mail package to Jason Wilson. She further stated that the Boyton address was phony and that she lived around the corner from Boyton. Lopez again repeated that Wilson had asked her for the LSD.

19. After making the above-summarized statements, Lopez appeared very concerned about what was going to happen to her. I explained to Lopez that I was going to prepare a report to the U.S. Attorney's Office. I told her that it was not my decision as to whether she would be prosecuted. Lopez asked if her cooperation would help her. I told Lopez that I could not make any promises and that I could only speak to her about my experience in similar investigations. I told Lopez that it had been my experience that when people took responsibility in my cases, their acceptance of responsibility appeared to be considered by the Court. I asked if she wanted to provide a written statement which would give her a chance to tell her side of the story in her own handwriting. She declined. I briefly reviewed the handwriting exemplars which Lopez had just provided and came to the conclusion, as a non-expert, that she was attempting to disguise her writing. I asked Lopez if she could provide me with better-quality handwriting and she laughed and said "you already have what you need," or words to that effect. I told her that she couldn't blame me for trying.

20. Lopez was very concerned about what would happen to her since she was attending San Jose State. I asked her if there was anything she had not told me about her past criminal activity and she said no. She told me that she had been previously convicted of driving under the influence; I subsequently learned that she had additional driving-related criminal conduct which she had not brought to my attention.

21. I gave Lopez a business card and advised her to make sure she kept in touch if she was going to move or change her phone number. She told me she would. When I was leaving, Lopez thanked me for being so nice to her and apologized for not telling me the truth right away when I had asked if she had sent LSD to Jason.

22. I have reviewed the declaration submitted by Lopez. Lopez's sworn statement is

DECLARATION OF
MITCHELL A. HERZOG                              6

1 | inaccurate to the extent that she suggests that she repeatedly requested a lawyer. I recall her
2 | asking if she <u>needed</u> a lawyer a single time at the outset of the interview; she never stated that she
3 | wanted a lawyer, even after I read her Miranda warnings, and she did not bring the up the lawyer
4 | issue again. Lopez's statement that I threatened to arrest her is similarly false; I never told her
5 | that I would arrest her, and made no effort to arrest her that day despite her candid admissions of
6 | LSD trafficking activity.

7 |     23. The interview was conducted in a calm, professional manner. I did not raise my voice or
8 | display my firearm during the interview. I did not threaten, intimidate, coerce, or force Lopez
9 | into providing her statements in any way. She was free to go at any time. She was never
10 | handcuffed and I did not take her into custody. It appeared to me that she was an intelligent and
11 | rational individual who understood the purpose of my questioning and understood the warning
12 | and waiver form which she completed in my presence. I personally watched Lopez read and sign
13 | the form.

14 |     I declare under penalty of perjury that the foregoing is true and correct to the best of my
15 | knowledge at San Jose, California on October 24, 2007.

*[Signature]*
MITCHELL A. HERZOG
United States Postal Inspector

DECLARATION OF
MITCHELL A. HERZOG      7