Memo to File

| | |
|---|---|
| CASE NO | : 0685-1658517-PMIN(1) |
| SUBJECT | : Response to Defense Motion |
| DATE | : October 20, 2007 |
| PREPARED BY: | : M A Herzog<br>Postal Inspector |
| DATE MEMO PREPARED | : October 20, 2007 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On October 19, 2007, I received an email from AUSA Jeff Nedrow. It was requested that I review the motion and review the Complaint for the Arrest Warrant I had secured on May 3, 2007. The following are the facts relative to the interview of Claudia Lopez I conducted on April 18, 2007.

On April 18, 2007, at approximately 5:00 PM, I parked in front of the 4 plex, 654 Rebecca Way, San Jose, CA, owned by Claudia Lopez's mother and step father. I went to Apt #3. I had learned from a Grand Jury Subpoena of a cell phone number provided by Jason Wilson, that the cell phone belonged to Claudia Lopez. I had also learned that the billing address for the cell phone was at 654 Rebecca Way. Previously, I had verified with the Postal Letter Carrier that Claudia Lopez received mail at 654 Rebecca Way, Apt 3. Based on the information I had received for Postal Inspector Norm Longaza I knew that Claudia Lopez had mailed an Express parcel to Jason Wilson in Anchorage, Alaska. I had previously gone to the Westgate Station and retrieved the finance copy of the Express Mail label. Prior to going to 654 Rebecca Way, Apt 3 I had established that Claudia Lopez was the focus of my investigation.

When I knocked on the door of Apt 3, a young woman answered the door. I asked if she was Claudia Lopez and she said she was. I showed her my credential and explained I was an investigator for the Post Office. She invited me into the apartment and she had to restrain her dog. After Claudia had her dog sit down in the living room, she invited me to sit at the kitchen table. We talked about her dog and I told her that I had just recently put down my German Sheppard. Claudia then asked me why I needed to speak with her. I explained to her that I needed to read her Miranda rights before I could ask her any questions. Claudia asked me if she needed a lawyer. She never told me that she wanted a lawyer. She explained that she was taking classes at San Jose State and did not want her rights violated. I explained I could not advise her if she needed a lawyer. I told Claudia that I had no intention of violation her rights and in fact I needed to explain her rights to her per the Miranda Warning. I pulled a Warning and Waiver of Rights form from my file and began to explain her rights. At 5:05 PM she signed the warning portion of the form. I then began to explain the Waiver portion of the form. We talked for nearly seven



EXHIBIT 2

minutes about the Waiver of rights. I explained to Claudia that she could speak with me and not answer any question that she didn't want to answer. I told her she could write down these questions and that we could go on with my interview and she could again decline to answer or even end the interview if she wished. Claudia wanted to know why I was there and did not express any concern about speaking with me. She never again asked me if she needed a lawyer. At 5:12 PM Claudia signed the Waiver portion of the Warning and Waiver form and agreed to answer my questions. After Claudia signed the Waiver portion of the form I then completed a Personal History Data form asking her some background information. After completing the Personal History I then began to ask Claudia some questions relative to my investigation, specifically if she knew Jason Wilson. Claudia told me she knew Jason Wilson and his girl friend Rhea Dillard. She made no admissions during this portion of the interview. (Refer to the Memorandum of Interview dated April 18, 2007.)

At some point during the interview, Claudia's daughter Ring Lomeli and the daughters father, whose name I did not remember, came back into the apartment. Claudia appeared embarrassed and asked him if he would take her daughter to the park. Claudia told him she needed to speak with me in private. I never made any suggestions regarding the presence of her daughter and the father. Claudia explained that he was staying with her for a while as he was looking for work in the area.

I then explained to Claudia that I needed handwriting exemplars from her. I never told her that I was going to arrest her at any time during the interview. I did tell her that she didn't have to give me the handwriting and if she refused I could go and obtain a Grand Jury Subpoena which would require her to provide the handwriting. I explained that it was much easier to take care of it now rather that appearing before the Grand Jury. Claudia consented and at 5:35 PM began to provide me with handwriting. I had her complete a PS Form 582 which is a basic handwriting sample. I then had her complete 5 blank Express mail labels. As indicated in my Memorandum of Interview, when she had completed the handwriting I looked at them and compared them to the Express mail label I had recovered. When I told Claudia that I thought her handwriting looked good when compared to the label she then made incriminating statements. (See Memorandum of Interview)

Claudia admitted to mailing the express parcel to Jason Wilson for his personal use. After she made her admissions she was very concerned about what was going to happen next. I explained to Claudia that I was going to prepare a report to the US Attorney's office. I told her it was not my decision if they would prosecute her. She asked if her cooperation would help her. I told her that I could not make any promises and that I could only speak to her about my experience in similar investigations. I told Claudia that it had been my experience when people took responsibility in my cases that often that was a consideration by a judge. I asked if she wanted to provide a written statement which would give her a chance to tell her side of the story in her own handwriting. She declined. I again reviewed the handwriting exemplars and could she that she was attempting to disguise her writing. I asked Claudia if she would provide me with better handwriting and she laughed and said you already have what you need. I told her you can't blame me for

trying. Again, Claudia was very concerned about what would happen to her since she was attending San Jose State. I asked her if there was anything she had not told me about her past criminal activity and she said no. I gave Claudia a business card and advised her to make sure she kept in touch if she was going to move or change her phone number. She told me she would. When I was leaving Claudia thanked me for being so nice to her and apologized for not telling me the truth right away when I had asked if she had sent to LSD to Jason.

M A Herzog
Postal Inspector